ADAM GORDON
United States Attorney
DEREK KO
Assistant U.S. Attorney
Florida Bar No. 83498
LYNDZIE M. CARTER
Assistant U.S. Attorney
Kansas Bar No. 25773
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-7680/8780
Derek.Ko@usdoj.gov/Lyndzie.Carter@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-0549-LL |
| Plaintiff, | UNITED STATES' AMENDED SENTENCING MEMORANDUM |
| v. | Sentencing Date: December 1, 2025 |
| DARRELL DAVIS, | Time: 10:00 a.m. |
| Defendant. | |

For the totality of his criminal conduct, Darrell Davis should be sentenced to 120 months in custody followed by 10 years of supervised release.

**A. Offense Conduct**

The Presentence Report (PSR) accurately details the investigation of Mr. Davis, including his involvement in sex trafficking Adult Female 1 (AF1), who he forced and coerced to perform commercial sex acts for his financial benefit. The United States submits to the Court that paragraphs 4 – 19 of the PSR detail the activities and the investigation of the Defendant in his trafficking activity. As admitted in Defendant's plea agreement, Mr.

Davis forced AF1 to engage in commercial sex work while in the Southern District of California.

### B. Victim Impact and Restitution

AF1 was recruited into the pimping and prostitution subculture, for the first time, by Mr. Davis. Additionally, AF1 was clear in her statement that she felt compelled to prostitute for Mr. Davis in December 2022 and January 2023 due to a financial obligation to Mr. Davis and his resulting psychological coercion. AF1 went to the extremes of trying to negotiate with Mr. Davis for an exit fee.

The parties agree that the restitution in this case should be at least $9950.

### C. Guidelines Calculation

The guidelines calculations are detailed in the plea agreement and will be filed separately in a sentencing summary chart.

### D. Criminal Forfeiture

Pursuant to the plea agreement, the United States will ask that the Court orally order forfeiture of the materials at the time of sentencing, and include forfeiture in the final judgment.

### E. Special Assessment

The parties agree that Mr. Davis should pay the $100 special assessment. However, given his lack of assets and the possible length of his sentence, the United States believes that although Mr. Davis has some assets, Mr. Davis is indigent for the purposes of JVTA. As such, the additional special assessment should not be imposed in favor of Mr. Davis being able to direct his efforts towards paying the restitution.

### F. Paragraphs 1, 2 and 6 of the Factual Basis

Pursuant to Section II of the plea agreement, the United States is free to argue the additional fact set forth in the stricken paragraphs 1, 2, and 6 of the factual basis. Mr. Davis, in his objections to the PSR, has disputed the allegations in those paragraphs. However, that information was developed from AF1's statements to law enforcement. Notably, AF1's statements have been directly and consistently corroborated where there has been

available extrinsic evidence. A non-exhaustive list of such examples, as summarized in the plea agreement, is set forth below. While the stricken portions of paragraphs 1, 2, and 6 may not have the same type of direct corroboration, there is still significant evidence to support AF1's statements regarding those events. Therefore, the United States submits that her statements setting forth the stricken portions of paragraphs 1, 2, and 6 should be fully credited.

### i. The Undisputed Paragraphs

Paragraphs 3, 4, 5, and 7 of the factual basis set forth how AF1 came to be working for Mr. Davis as a prostitute, again, in December 2022 and January 2023. Specifically, AF1 gave San Diego Human Trafficking Task Force investigators a detailed account of how she got into a car accident while doing donuts in a mutual acquaintance's car, which turned into in AF1 owing Mr. Davis money for the repairs. Mr. Davis then required AF1 to repay him by working for Mr. Davis as a prostitute, again. Exhibit 1, AF1's Statement, 6:12 – 10:24. The amount owed for the repairs was originally around $2300. Exhibit 1, AF1's Statement, 42:30 – 43:40. AF1's statements were corroborated by artifacts recovered from the Notes application of Mr. Davis's cell phone. Exhibit 2, Notes. The first note consisted of a ledger of prostitution earnings for three women who were working for Mr. Davis. With respect to AF1, the note listed her debt as $2300 and it showed how much AF1 had paid as of "12/31". Exhibit 2, Note 1. The third note had a detailed breakdown of the costs of some car repairs and towing fees consistent with what AF1 described. Exhibit 2, Note 3. Notably, the total costs listed in that note were substantially lower than the $2300 listed in Note 1 and which Mr. Davis quoted to AF1.

Paragraphs 8, 10 of the factual basis set forth how Mr. Davis, AF1, and others traveled from Sacramento San Diego for purposes of prostitution. This also included stops to work the "blades" in other cities along the route. Exhibit 1, AF1's Statement, 50:23 – 55:59. When AF1 told investigators about the trip and the group's activities in San Diego, she referenced information in her phone to help her figure out precise dates and showed that same information to the investigators. AF1's recollection of the events was

3

corroborated by Mr. Davis's notes regarding the earnings from AF1 and the other parties that AF1 identified as being on the trip. Exhibit 2, Note 1. AF1's statements about the other cities in which the group stopped were corroborated by a note from Mr. Davis's phone in which he had written out the locations of the "blades" for those same cities (as well as others). Exhibit 2, Note 4.

Paragraph 9 of the factual basis sets forth Mr. Davis's creation of a commercial sex ad for AF1. In her statement, AF1 was clearly unfamiliar with posting commercial sex ads and struggled to remember the name of the site to which Mr. Davis posted. After AF1 remembered that the site contained the term "personals" with another term in front of it, one of the investigators asked if she was referring to MegaPersonals, one of the most widely known sites in the pimping and prostitution subculture. AF1 then excitedly confirmed that she thought that was it. Exhibit 1, AF1's statement, 28:10 – 30:06. These statements were corroborated by emails recovered from Mr. Davis's phone. Those emails were received from the email address "donotreply@megapersonals.com" and the subject line "MegaPersonals: Manage Post". They also demonstrated a prolific history of Mr. Davis posting ads on MegaPersonals. Exhibit 3, Emails.

Paragraph 13 of the factual basis sets forth Mr. Davis's continued financial control over AF1 via the $2300 debt that he told her that she owed to him. When AF1 described her attempts to clear the debt, she referenced a ledger she had kept in her phone which she also showed to the investigators: Exhibit 1, AF1's Statement, 35:28 – 37:30. AF1's statement is further corroborated by the aforementioned ledger that Mr. Davis independently kept. Exhibit 2, Note 1.

Paragraph 14 sets forth the coercion and physical violence that Mr. Davis used against AF1 which prompted AF1 to seek help from others, eventually resulting in her recovery by the San Diego Human Trafficking Task Force. Specifically, AF1 described how she was making efforts to get away from Mr. Davis that resulted in him slapping her so hard that she became disoriented. Exhibit 1, AF1's Statement, 1:09:18 – 1:15:30. That

was corroborated by the marks on AF1's face once she removed the makeup that had been covering it. Exhibit 1, AF1's Statement. 1:46:45 – 1:47:30.

AF1 also described trying to pay Mr. Davis a partial exit fee in the amount of $500 so that she could discontinue prostituting for him and return home. Exhibit 1, AF1's Statement, 1:09:18 – 1:15:30. This was corroborated by the CashApp transactions logged by Mr. Davis's phone which showed a transaction matching the one described by AF1:

| 185 | Date Sent<br>1/11/2023 2:17:00 AM(UTC+0)<br>Date Processed<br>1/11/2023 2:17:02 AM(UTC+0) | A▮▮<br>C▮<br>Ava▮<br>C▮ | USD $500 | | Completed | | Cash app |

Finally, AF1 described the abuse that Mr. Davis visited upon her when she returned to the group's hotel in Chula Vista after resting at an acquaintance's residence. This included aggressively grabbing AF1's breasts and threatening to check her genitals when searching for money that Mr. Davis suspected that AF1 had on her person. Exhibit 1, AF1's Statement, 10:30 – 14:50. This was corroborated by a "selfie" video taken by one of the other women prostituting for Mr. Davis in which a male can be heard yelling at someone consistent with the manner that AF1 described. Exhibit 4, Selfie Video.

### ii. The Disputed Paragraphs

As demonstrated above, AF1's statements to investigators were strongly corroborated by extrinsic evidence, wherever such evidence was available. Furthermore, AF1's demeanor showed an individual who appeared genuine, who take great care to share what she knew and could recall, and who was forthright with investigators when she did not know the answers to their questions. Although the evidence set forth in the stricken paragraphs is not directly corroborated in the same way, there remains significant evidence to support the proposition that the events occurred as AF1 described.

Paragraphs 1 and 2 of the factual basis set forth AF1's recruitment into prostituting for Mr. Davis. AF1 described the two individuals who first introduced AF1 to Mr. Davis. Exhibit 1, AF1's Statement, 14:55 – 16:15. Notably, the name of one of the individuals that AF1 described as having introduced her to Mr. Davis has a similar name to one of the

individuals listed in Mr. Davis's ledger of prostitution earnings. Exhibit 2, Note 1. AF1 then described the process of how Mr. Davis recruited AF1 into the pimping and prostitution subculture. Exhibit 1, AF1's Statement, 18:20 – 28:10. When describing her recruitment, AF1 repeatedly checked her phone to confirm date ranges and find other information, all of which she shared with and showed investigators. AF1 also described the period when she discontinued prostituting for Mr. Davis the first time. Exhibit 1, AF1's Statement, 30:05 – 32:05.

Paragraph 6 of the factual basis sets forth the basis for AF1's fear of Mr. Davis using physical violence against her. When AF1 describes her concerns about Mr. Davis being at large, she is visibly distraught. Exhibit 1, AF1's Statement, 38:20 – 42:28. At that time, AF1 also noted that Mr. Davis carried a gun. Indeed, investigators located a gun matching the description given by AF1. AF1 also stated that Mr. Davis forced her to prostitute for him, at points. Critically, AF1 was clear that Mr. Davis did not force her to prostitute for him through physical violence, but rather through means which she had difficulty describing. Exhibit 1, AF1's Statement, 43:46 – 45:40. This included intimidation and violence that AF1 had seen Mr. Davis use against others. Had AF1 wanted to fabricate or exaggerate the means that Mr. Davis used against her, it would have been much easier for AF1 to simply state that Mr. Davis was physically violent and forced her to work for him. Instead, AF1 described, with great difficulty, a more subtle pattern of manipulation. AF1 reiterated at multiple points that she had seen Mr. Davis be violent with others. Exhibit 1, AF1's Statement, 48:43 – 49:23. This was corroborated by at least two messages in which a contact saved in Mr. Davis's phone as "Princess" lamented to Mr. Davis that he had hit her. Exhibits 5 and 6, 01012023 Messages.

When the circumstances are viewed in their totality, it is clear that AF1's underlying statements that support the stricken parts of paragraphs 1, 2, and 6 should be fully credited. Where there is available extrinsic evidence, AF1's statements have been strongly corroborated. There is also corroboration for AF1's statements that support paragraphs 1, 2, and 6 in the form of her demeanor, her careful and thoughtful characterization of events,

and the subtle nuggets of truth delivered through various other means such as the gun and text messages. There is nothing to suggest that after being truthful about all of these facts, AF1 was somehow untruthful about the parts of her statement for which there was no extrinsic evidence. Furthermore, at the time she gave the statement, she would not have had a way to know what parts investigators would be able to extrinsically corroborate. Therefore, all of the statements should be viewed in the same light. That is, they are entirely credible.

### G. Government's Sentencing Recommendation

Though Mr. Davis has unquestionably accepted responsibility, has equities due to a difficult upbringing, and has expressed remorse for his actions, this Court cannot ignore the totality of his criminal conduct. Mr. Davis sex trafficked AF1 by force and coercion. Mr. Davis is also suspected to have sex trafficked at least two other individuals. His past and continuing conduct is alarming.

Moreover, while the United States recognizes Mr. Davis's difficult upbringing, the United States also notes that Mr. Davis's siblings appear to have enjoyed a fair degree of academic and professional accomplishments.

This Court obligation is to provide fair and just punishment to Mr. Davis, and on behalf of his victim. His remorse does not erase the harm he inflicted on AF1 and likely others. For these reasons, the United States recommends a sentence of 120 months in custody, followed by 10 years' supervised release.

Date: November 25, 2025

Respectfully submitted,
ADAM GORDON
United States Attorney

*/s/ Derek Ko*
Derek Ko
Lyndzie M. Carter
Assistant U.S. Attorneys